IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                        Case No. 3:24-cr-113

RONALD LORENZO RONEY,

     Defendant.

### MEMORANDUM OPINION

This matter is before the Court on MR. RONEY'S OBJECTION TO TWO-LEVEL ENHANCEMENT UNDER U.S.S.G. § 2D1.1(b)(12), ECF No. 30 ("the OBJECTION"), the several supporting, opposing, and supplemental briefs in response thereto, ECF Nos. 35, 36, 41, 42, 43, 49, 50, 54, 58, 60, the STATEMENT OF FACTS, ECF No. 22, the PRESENTENCE INVESTIGATION REPORT ("PSR"), ECF No. 63, the factual record, and the oral argument by the parties at Sentencing Hearings held on April 17, 2025, June 18, 2025, and August 22, 2025. ECF Nos. 46, 47, 55, 56.

Defendant Ronald Lorenzo Roney's ("Roney" or "Defendant") was convicted of Possession with Intent to Distribute a Controlled Substance (fentanyl and cocaine), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), following the entry of a guilty plea. ECF No. 23. Before sentence was imposed, Roney OBJECTED to the PSR because it recommends imposing a two-point sentencing enhancement under the United States Sentencing Guidelines (the "Guidelines") to his Offense Level for maintaining "a premises for the purpose

of . . . distributing a controlled substance" pursuant to U.S.S.G. § 2D1.1(b)(12) (the "premises enhancement").

Roney relies on the decision of the Supreme Court of the United States in <u>Kisor v. Wilkie</u>, 588 U.S. 558, 139 S. Ct. 2400, 204 L. Ed. 2d 841 (2019), and the decision of the United States Court of Appeals for the Fourth Circuit in <u>United States v. Boler</u>, 115 F.4th 316 (4th Cir. 2024), <u>reh'g en banc denied</u>, No. 23-4352, 2024 U.S. App. LEXIS 24011 (4th Cir. Sept. 20, 2024), to argue that the enhancement is not genuinely ambiguous and that its unambiguous meaning does not encompass his conduct. The United States disagrees and, instead, argues that the premises enhancement is genuinely ambiguous; that the Commentary interpreting that enhancement is reasonable and warrants deference; and that Roney's conduct falls within the parameters of the premises enhancement.

Whether the text of U.S.S.G. § 2D1.1(b)(12) is genuinely ambiguous under the <u>Kisor</u> and <u>Boler</u> framework is a question that has not been decided by the Fourth Circuit. For the reasons set forth below, the Court holds that: (1) the text of the enhancement, U.S.S.G. § 2D1.1(b)(12), is not genuinely ambiguous; and (2) under that unambiguous meaning, the premises enhancement does not apply to Roney.[1] Therefore, the OBJECTION, ECF No. 30, was sustained.

---

[1] Because the premises enhancement is not genuinely ambiguous, the Court need not assess whether the Commentary interpreting the

2

This Memorandum Opinion explains the rationale for that decision.

## I. BACKGROUND

### A. FACTUAL HISTORY

In December 2022, law enforcement officers with the Virginia State Police ("VSP") and Chesterfield Police Department ("CPD") initiated a multijurisdictional investigation into the drug trafficking activities of Roney and other individuals. PSR, ¶ 10. As part of that investigation, law enforcement officers arranged for confidential informants to make five controlled purchases from Roney, one each on December 8, 2022, December 20, 2022, January 27, 2023, February 24, 2023, and March 16, 2023. Id. ¶¶ 11-14. A total of 10 ounces of cocaine and 2 ounces of fentanyl were purchased as part of those controlled purchases. Id.[2] And, the PSR shows, with no dispute, that, from June 2022 until December 2022, Roney was involved in the sale of an additional eight ounces of cocaine. Id. ¶¶ 12, 23. All of the sales made by Roney took place away from his residence.

The investigation concluded on March 31, 2023, with the execution of nine search warrants across six different residences, one of which was Roney's apartment, which was located at 120 Perry

---

premises enhancement is reasonable or if it warrants deference.

[2] Roney charged $1,000.00 per ounce of cocaine and $1,500.00 per ounce of fentanyl. So, the total spent on these controlled purchases was $13,000.00. PSR ¶¶ 11-14.

Street, Building #2, Apt. 432, Petersburg, Va, 23803. Id. ¶ 16. Roney lived at that residence along with his fiancée, Ms. Shavone Robinson, and her father. Id. ¶ 53. At Roney's residence, law enforcement officers recovered a total of 2.825 kilograms of fentanyl, 4.965 kilograms of cocaine, and four hundred and eighty-five (485) "blue M30 pills."[3] Id. ¶ 9; ECF No. 22, at 1. The PSR calculated the total converted drug weight of these seizures to equal 9,938.05 kilograms. PSR, ¶ 23. Those controlled substances were found in several different places within Roney's bedroom. Officers also recovered packaging materials, digital scales, a mechanical press, multiple cell phones, and $55,945.00 from that room. Id. ¶¶ 9, 16. A money counter was found in a different room in the residence. Id. ¶ 16.

The record thus shows that Roney was engaged in substantial drug trafficking, that he kept the product and the tools of drug trafficking at the residence, and that he made the sales of product away from the residence. Roney rented and paid for the apartment.

## B. PROCEDURAL HISTORY

Following the search of his residence, Roney was arrested. A single count INDICTMENT was returned, which indicted Roney for the

---

[3] It is unclear exactly what substance constituted the blue M30 pills. Roney stated that he possessed approximately "300 Percocet pills." ECF No. 22, at 1. The PSR states that it was "noted that [the] blue 'M30 pills' appeared to be counterfeit 30 mg Oxycodone pills," but also states that no laboratory testing was completed for those pills. PSR, ¶ 16 n.1.

possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). ECF No. 16. Roney later entered a PLEA AGREEMENT, ECF No. 23, and pled guilty before United States Magistrate Judge Summer L. Speight who provided a Report and Recommendation, ECF No. 25, which the Court adopted by ORDER. ECF No. 26. A Sentencing Hearing was originally scheduled to take place on February 13, 2025.

The United States Probation Office prepared the PSR,[4] which calculated a sentencing range pursuant to the Guidelines. The PSR assessed Roney a Base Offense Level of 32 for a violation of 21 U.S.C. § 841(a) where the amount of converted drug weight was at least 3,000, but less than 10,000, kilograms pursuant to U.S.S.G. § 2D1.1(a)(5), (c)(4). PSR, ¶ 23. Then, the PSR enhanced Roney's Offense Level by applying a two-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) because he "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12); PSR, ¶ 24. Following that addition, the PSR subtracted three points from Roney's Offense Level because he accepted responsibility for his actions and assisted officers in

---

[4] The initial PSR was filed on January 8, 2025, ECF No. 27, which was amended, and subsequently refiled, four times, once on January 30, 2025, ECF No. 28, April 11, 2025, ECF No. 44, June 3, 2025, ECF No. 53, and August 22, 2025, ECF No. 63. When referring to the PSR throughout this MEMORANDUM OPINION, the Court refers to the most recently published PSR, ECF No. 63, which contains all of the same pertinent information as those filed before it.

the investigation into his criminal conduct. PSR, ¶¶ 30-31. Consequently, after all of these changes were implemented, the PSR calculated Roney's Total Offense Level at 31. Id. ¶ 32. The PSR also assigned Roney a Criminal History Category of II based on a prior conviction for conspiracy to distribute and possess controlled substances. Id. ¶¶ 35-38. With an assigned Total Offense Level of 31 and a Criminal History Category II, the PSR correctly calculated Roney's sentencing guidelines range at between 121-151 months of incarceration. Id. ¶ 68.

Roney filed the OBJECTION, ECF No. 30, arguing that the two-point premises enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) should not apply to him under the standards set out in Kisor, 588 U.S. 558, and Boler, 115 F.4th 316. ECF No. 41.[5] Without the inclusion of the premises enhancement, Roney's Offense Level would reduce from 31 to 29, which, when combined with his Criminal History Category of II, would place him in a new sentencing guidelines range of 97-121 months of incarceration. U.S.S.G. Ch. 5, Pt. A. The United States filed an opposition brief, ECF No. 42, arguing that the enhancement should apply. Roney filed his reply shortly thereafter. ECF No. 43.

---

[5] In the initial brief supporting Roney's OBJECTION, Roney relied on an outdated standard of review in evaluating the applicability of a guideline provision for the basis of his OBJECTION. ECF No. 30. The Court ORDERED new briefing so that the parties presented and addressed the OBJECTION pursuant to the correct standard under Kisor and Boler. ECF No. 39.

The Court held the first Sentencing Hearing on April 17, 2025, to consider argument on the OBJECTION. ECF No. 46. The parties were then ordered to file supplemental briefing to assist in the review of the OBJECTION. ECF Nos. 50, 51, 54. A second Sentencing Hearing was convened on June 18, 2025, to again consider argument on the OBJECTION in light of the supplemental briefing. ECF No. 55. The Court then required an additional set of supplemental briefs regarding the appropriateness of applying the premises enhancement to Roney. ECF Nos. 58, 60. Following the conclusion of that round of briefing, the Court convened a final Sentencing Hearing on August 22, 2025. ECF No. 61. At that Sentencing Hearing, after hearing oral argument and having had considered all of the briefs, the Court sustained Roney's OBJECTION, ECF No. 30, and imposed a sentence of incarceration of 121 months—a sentence at the maximum of Roney's sentencing guidelines range that excluded in its calculation the two-point premises enhancement pursuant to U.S.S.G. § 2D1.1(b)(12).

## II. STANDARD OF REVIEW

Although this matter is before the Court on the Defendant's OBJECTION, the United States has the burden to prove, by a preponderance of the evidence, that the enhancement, U.S.S.G. § 2D1.1(b)(12), should apply to Roney. United States v. Reyna, 336 Fed. App'x 353, 354 (4th Cir. 2009) (per curiam) (unpublished) (citing United States v. Kiulin, 360 F.3d 456, 460 (4th Cir.

7

2004)). And, when making findings of fact "to appropriately calculate the advisory guideline range," the Court must find that the United States has proven those facts "by a preponderance of the evidence." United States v. Harvey, 532 F.3d 326, 337 (4th Cir. 2008) (citing United States v. Battle, 499 F.3d 315, 322-23 (4th Cir. 2007)).

### III. DISCUSSION

The dispute today arises over whether the two-point premises enhancement, U.S.S.G. § 2D1.1(b)(12), should be included in the calculation of Roney's Offense Level in the PSR that forms the basis of his recommended sentencing range pursuant to the Guidelines. That enhancement reads, in full, as follows:

> If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase [the Offense Level] by 2 levels.

U.S.S.G. § 2D1.1(b)(12) (emphasis added). The dispute is over the phrase "for the purpose of . . . distributing," specifically, whether that phrase is genuinely ambiguous. To assess that question, the Court must assess the phrase's meaning pursuant to the standard established in the decisions of Kisor, 588 U.S. 558, and Boler, 115 F.4th 316.

The analysis begins by noting that, until recently, challenges, or "objections," to the application of a sentencing guideline based on the Commission's Commentary interpreting that guideline were adjudicated pursuant to the standard established by

8

the Supreme Court in <u>United States v. Stinson</u>, 508 U.S. 36, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993). <u>Stinson</u> held that the Commission's Commentary, which interprets the meaning of a Guideline or enhancement itself, is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." <u>Id.</u> at 38. So, when considering such challenges, courts would typically defer to the Commentary's interpretation of a guideline.

In 2019, the Supreme Court held in <u>Kisor</u> that agencies' interpretations of their own regulations were to be assessed under a similar deference standard as that established by <u>Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), which provided the standard for reviewing agencies' regulations that interpreted congressionally enacted statutes. Specifically, in <u>Kisor</u>, the Supreme Court held that, before deferring to agencies' interpretation of their own regulations, courts must first assess the language of the regulation itself to determine if that language was "genuinely ambiguous." <u>Kisor</u>, 588 U.S. at 573, 575. If a court determined that the regulation's text was genuinely ambiguous, then it could examine the agency's interpretations of that regulation for further guidance. However, only those agency interpretations that are "reasonable" were of the sort that could potentially receive judicial deference, and, even if reasonable, a court need not defer

9

to those interpretations unless certain additional preconditions were met. Id. at 575-79. In the wake of Kisor, the circuit courts split over whether to continue to apply the Stinson standard when reviewing challenges to the Guidelines' Commentary or to adopt the more general Kisor standard of review even for the Guidelines. United States v. Crawford, No. 3:24-cr-169, ___ F. Supp. 3d ___, 2025 U.S. Dist. LEXIS 145349, at *23 (E.D. Va. July 28, 2025) (citing United States v. Pratt, No. 20-10328, 2021 U.S. App. LEXIS 37022, at *6-7 (9th Cir. Dec. 15, 2021) (mem.) (unpublished); Boler, 115 F.4th at 322).

In 2024, the Supreme Court overruled Chevron and jettisoned the deference standard that it required when courts were assessing agencies' regulatory interpretations of congressionally enacted statutes, which was the standard that undergirded Kisor deference. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 144 S. Ct. 2244, 2273, 219 L. Ed. 2d 832 (2024). Also, in 2024, the Fourth Circuit found that Kisor had abrogated Stinson and thus adopted Kisor's approach for the review of the Sentencing Guidelines. Boler, 115 F.4th at 322 n.4. Therefore, when considering whether U.S.S.G. § 2D1.1(b)(12) should apply to Roney, the Court must do so pursuant to the standards set forth in Kisor and Boler. See Crawford, 2025 U.S. Dist. LEXIS 145349, at *24.

At the first step of the Kisor/Boler analysis, courts are to use "all the standard tools of interpretation" to examine the text

of the enhancement to determine whether it is "genuinely ambiguous." Kisor, 588 U.S. at 573, 575; Boler, 115 F.4th at 322-23. That inquiry requires the sentencing court to "carefully consider the text, structure, history, and purpose" of the enhancement "in all the ways it would if it had no agency to fall back on." Kisor, 588 U.S. at 575; Boler, 115 F.4th at 335.

If the determination is that the enhancement's language is not genuinely ambiguous, then the court must "state that unambiguous meaning and apply the enhancement accordingly." In doing so, courts may not consider the Commission's Commentary that interprets the enhancement "in its review or application." United States v. Roberts, No. 3:24-cr-137, ___ F. Supp. 3d ___, 2025 U.S. Dist. LEXIS 114613, at *18-19 (E.D. Va. June 16, 2025); Crawford, 2025 U.S. Dist. LEXIS 145349, at *24 (citing Roberts, 2025 U.S. Dist. LEXIS 114613, at *18-19).

The analysis only continues to Kisor and Boler's second step if the enhancement's language is found to be genuinely ambiguous. At the second step, the task is to determine if the Commission's Commentary that interprets the enhancement's language is within the "zone of ambiguity" so that it resides "within the bounds of reasonable interpretation." Kisor, 588 U.S. at 575-76 (quoting Arlington v. FCC, 569 U.S. 290, 296, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013) (internal quotation marks omitted)); Boler, 115 F.4th at 323. If the Commentary's interpretation is unreasonable, it is

not entitled to deference, and the court must, instead, determine if the conduct at issue can legitimately fall within the conduct captured by the enhancement's genuinely ambiguous language. Crawford, 2025 U.S. Dist. LEXIS 145349, at *25 (citing Roberts, 2025 U.S. Dist. LEXIS 114613, at *19). However, even if the Court determines that the Commentary is a reasonable interpretation of the enhancement, deference is not necessarily warranted and a third step remains for consideration. Kisor, 588 U.S. at 576-77; Boler, 115 F.4th at 323.

The third step permits deference to a reasonable interpretation of the Commentary if "Congress would have wanted" that interpretation based on an "independent inquiry into whether the character and context of the [Commission's] interpretation entitles it to controlling weight." Kisor, 588 U.S. at 576; Boler, 115 F.4th at 323. In this inquiry, courts are to consider a set of (nonexhaustive) factors, including whether: (1) the interpretation is the "official position" of the Commission; (2) the interpretation implicates the Commission's "substantive expertise"; and (3) the interpretation "reflects the fair and considered judgment" of the Commission. Kisor, 588 U.S. at 577-79; Boler, 115 F.4th at 328.

Whether the phrase "for the purpose of . . . distributing" is genuinely ambiguous is a question that has not been decided by the Fourth Circuit. However, in United States v. Thaxton, the United

12

States Court of Appeals for the Ninth Circuit held that the phrase "for the purpose of" was genuinely ambiguous because "it has a spectrum of possible meanings." United States v. Thaxton, No. 23-4196, 2025 U.S. App. LEXIS 4310, at *3 (9th Cir. Feb. 25, 2025) (per curiam) (unpublished) (citing United States v. Shetler, 665 F.3d 1150, 1161 (9th Cir. 2011) (holding that identical language in 21 U.S.C. § 856(a)(1) has "various formulations" that range between "the poles of 'incidental use' and 'sole purpose'" (internal citation omitted))). After determining that the premises enhancement was genuinely ambiguous, the Ninth Circuit considered the Commentary interpreting the enhancement and held that the Commentary provided a reasonable interpretation that warranted judicial deference. Id. at *3-4. Based on that reading and the facts of the case, the Ninth Circuit applied the premises enhancement to the defendant. Id. at *4.

The United States urges the Court to follow Thaxton's lead and find that: (1) the text of the premises enhancement is genuinely ambiguous; (2) the Commentary interpreting that text is reasonable; (3) the Commentary warrants judicial deference; and (4) that the facts of this case support the application of the premises enhancement to Roney under this standard. Roney disagrees. Instead, Roney contends that the enhancement's text is not genuinely ambiguous and does not encompass his conduct in this case, including the possession of the drugs with intent to

distribute them at different locations and the storage of those drugs at his premises. As part of that position, Roney argues that, under the unambiguous meaning of the enhancement (maintaining the premises for the purpose of distribution), the distributive conduct must occur <u>at or on the premises itself</u>. Therefore, Roney argues that, because his distribution did not occur at the premises, his Offense Level should not be increased pursuant to the premises enhancement.

**IV. ANALYSIS**

The analysis necessitates consideration of the "text, history, structure, and purpose," of the premises enhancement "in all the ways [the Court] would if it had no agency to fall back on." That requires the use of "all the standard tools of interpretation" in the analysis of genuine ambiguity. <u>Kisor</u>, 588 U.S. at 573, 575; <u>Boler</u>, 115 F.4th at 335.

**A. THE TEXT OF THE PREMISES ENHANCEMENT IS NOT GENUINELY AMBIGUOUS.**

First, the text of the premises enhancement, which reads as follows:

> If the defendant maintained <u>a premises for the purpose of</u> manufacturing or <u>distributing</u> a controlled substance, increase [the Offense Level] by 2 levels.

U.S.S.G. § 2D1.1(b)(12) (emphasis added). The text of the enhancement does not define the phrase "for the purpose of" or the

14

term "distributing."[6]

Absent a definition in the premises enhancement, courts must "construe terms in the Sentencing Guidelines according to their ordinary meaning." United States v. Haas, 986 F.3d 467, 480 (4th Cir. 2021). In doing so, the Court routinely turns to dictionaries for assistance. Boler, 115 F.4th at 323; Nat'l Coal. for Students with Disabilities Educ. and Legal Def. Fund v. Allen, 152 F.3d 283, 288-89 (4th Cir. 1998). And, the statute upon which an enhancement is based can provide "helpful insight" into the meaning behind terms used in the text of the enhancement itself. Roberts, 2025 U.S. Dist. LEXIS 114613, at *26-28; see also id. at *26 ("Typically, when a term is not defined in the text, courts must endeavor to 'accord the term its ordinary, common meaning, absent an indication Congress intended [it] to bear some different import.'" (quoting Teshome-Gebreegziabher v. Mukasey, 528 F.3d 330, 332 (4th Cir. 2008) (alteration in original) (internal

---

[6] The Commentary does provide insight into the meaning behind the term "distributing" and the term "purpose." U.S.S.G § 2D1.1 Comment., n.17. Indeed, during oral argument, Roney argued that, in finding that the premises enhancement is not genuinely ambiguous, the Court should consider the Commentary's interpretation of "purpose" to mean that the drug distribution must be the "primary," rather than an incidental, purpose of the premises. ECF No. 56, at 58-59, 69. However, at the first analytical step of the Kisor/Boler analysis, it is inappropriate to consider the Commentary and its interpretations of the premises enhancement to attribute any meaning to the text of that enhancement. So, the Court rejects Roney's argument to the extent that it attempts to use the Commentary to define the enhancement at this stage of the analysis.

quotation marks and citation omitted))). The words of any enhancement also "must be read in their context and with a view to their place in the overall regulatory scheme." Boler, 115 F.4th at 325 (quoting Lynch v. Jackson, 853 F.3d 116, 121 (4th Cir. 2017)) (alterations and quotation marks omitted).

With these principles in mind, the analysis starts by examining two core words in the phrase "for the purpose of . . . distributing," namely, the terms "distributing" and "purpose." U.S.S.G. § 2D1.1(b)(12). Then, and relatedly, it is necessary to examine the meaning of the word "the" that precedes the word "purpose."

### 1.    The Term "Distributing."

The language of the premises enhancement, U.S.S.G. § 2D1.1(b)(12), is based on 21 U.S.C. § 856. Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 6, 124 Stat. 2372, 2373. In 21 U.S.C. § 802, Congress provided a list of definitions for the terms used throughout Title 21. In that section, Congress gave a specific definition of the term "distribute." 21 U.S.C. § 802(11). More so than any dictionary definition, then, Section 802 operates as an instructive source for the meaning behind the term "distributing" as used in the text of the premises enhancement. Both parties stipulate as much. ECF No. 56, at 11 (the Defendant); id. at 26 (the United States). So, we begin there.

Section 802 defines the term "distribute" to mean: "to deliver

16

(other than by administering or dispensing) a controlled substance." 21 U.S.C. § 802(11) (emphasis added). Then, Section 802 goes on to define the active verb "deliver" used within the statutory definition of "distribute," to mean: "the actual, constructive, or attempted transfer of a controlled substance." Id. § 802(8) (emphasis added). The statute does not go on to define "transfer."

However, commonly used dictionaries point to a singular common meaning of "transfer" in this context. The Oxford English Dictionary defines the verb "transfer" to mean: "To convey or take from one place, person, etc. to another; to transmit, transport; to give or hand over from one to another." Transfer, Oxford English Dictionary, https://www.oed.com/dictionary/transfer_v?tab=meaning _and_use#17936121 (last accessed August 27, 2025) (emphasis added). Similarly, the Merriam-Webster Dictionary defines "transfer" to mean: "(a): to convey from one person, place, or situation to another; (b): to cause to pass from one to another." Transfer, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/transfer (last accessed August 27, 2025) (emphasis added). And, the American Heritage Dictionary, defines "transfer" as: "To convey or cause to pass from one place, person, or thing to another." Transfer, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=transfer (last accessed August 27, 2025) (emphasis added).

17

The dictionary definitions teach that, in this context, to "transfer" means to convey or give an object from one person to another. So, in the specific context of the premises enhancement, the statute upon which the premises enhancement was based and the relevant dictionary definitions provide an unambiguous meaning for the term "distributing." Based on those definitions, "distributing" encompasses the conduct of a defendant conveying, giving, or handing over a controlled substance to another individual. But, that is not the end of the analysis because a look at the context, history, and congressional purpose that was extant when the premises enhancement was developed and promulgated as reflected in the relevant decisional law is also instructive as to the meaning of the term "distributing."

We know that "'[D]istribute' is defined broadly under [21 U.S.C.] § 841(a)(1).'" United States v. Purks, 139 F.4th 388, 401 (4th Cir. 2025) (quoting United States v. Cortés-Cabán, 691 F.3d 1, 17 (1st Cir. 2012)). That is because "'the legislative history of § 841(a) 'quite clearly indicates that Congress specifically intended that distribution of drugs should be severely dealt with.'" United States v. Gore, 154 F.3d 34, 46 (2d Cir. 1998) (citations omitted). And, by entitling the statute "'Comprehensive' . . . Congress, in legislating against drug use, intended to encompass every act and activity which could lead to the proliferation of drug traffic.'" United States v. Gomez, 593

18

F.2d 210, 213 (3d Cir. 1979); Gore 154 F.3d at 46 (citing Gomez, 593 F.2d at 213). So, it is then that the broad and settled definition of distribution "'includes . . . acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price.'" Purks, 139 F.4th at 401-02 (quoting United States v. Colon, 268 F.3d 367, 377 (6th Cir. 2001)) (alteration in original).

In Purks, the Fourth Circuit also explained that the act of distribution can, and does, span time because "the act of distribution includes both negotiation and effectuation of a transfer." Id. at 402 (emphasis removed). Also, the act of distribution can span different locations because transfer "does not simply mean the moment when the defendant 'fully relinquishes possession' or receives the payment." Id. (quoting United States v. Brunty, 701 F.2d 1375, 1380-82 (11th Cir. 1983)) (alteration removed).

Relatedly, "the distribution provision has been held to criminalize 'participation in the transaction viewed as a whole.'" Brunty, 701 F.2d at 1381 (citations omitted). Therefore, it is understood that distribution includes arranging or supervising a delivery, negotiating for or receiving the purchase price, inspecting the purchase money, traveling to secure the drugs, serving as a broker or a guard: in sum "other acts perpetrated in furtherance of a transfer or sale." Brunty, 701 F.2d at 1381;

<u>Purks</u>, 139 F.4th at 401-02 n.8 (citing <u>Brunty</u>, 701 F.2d at 1381).

In other words, the term distribution, though broad, has a well-understood unambiguous meaning, reaching back well before the premises enhancement was passed. And, the decisional history confirms that distribution, or "distributing," is not an ambiguous term. It means acts perpetrated in furtherance of a transfer or sale of drugs. That there can be many such acts does not make the term "distribution" or "distributing" ambiguous.

### 2.    The Phrase "For The Purpose Of."

The operative term in this phrase is "purpose," which, unlike the term "distribute," is not defined in 21 U.S.C. § 802. So, the analysis begins by looking at dictionary definitions.

The <u>Oxford English Dictionary</u> defines the term "purpose" as: "<u>That which a person sets out to do or attain</u>; an object in view; <u>a determined intention</u> or aim . . . <u>The reason for which something</u> <u>is done or made, or for which it exists</u>; the result or effect intended or sought; the end to which an object or action is directed; aim." <u>Purpose</u>,    <u>Oxford    English    Dictionary</u>, https://www.oed.com/dictionary/purpose_n?tab=meaning_and_use#275 62170 (last accessed August 27, 2025) (emphasis added). Similarly, the <u>Merriam-Webster Dictionary</u> defines "purpose" to mean: "<u>Something set up as an</u> object or <u>end to be attained</u>: INTENTION." <u>Purpose</u>,    <u>Merriam-Webster    Dictionary</u>,    https://www.merriam-

webster.com/dictionary/purpose (last accessed August 27, 2025) (emphasis added). And, the American Heritage Dictionary defines "purpose" as: "The object toward which one strives or for which something exists; an aim or goal." Purpose, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=purpose (last accessed August 27, 2025) (emphasis added).

These dictionaries all provide substantially similar definitions for the term "purpose." Based on those definitions, the term "purpose," as used in the context of the premises enhancement, unambiguously means that the premises must exist for achieving the objectives of manufacturing or distributing of controlled substances.

In Thaxton, the Ninth Circuit reached the contrary conclusion, holding that the premises enhancement was genuinely ambiguous. Thaxton, 2025 U.S. App. LEXIS 4310, at *3. However, Thaxton did not examine the meaning of the term "distributing"; instead, the Ninth Circuit found genuine ambiguity in the phrase "for the purpose of" alone because, in its view, that phrase "has a spectrum of possible meanings." Id. But, Thaxton did not identify or examine what meanings exist within that "spectrum." Instead, the court simply stated that when it had previously "examin[ed] identical text in 21 U.S.C. § 856(a)(1)—the criminal statute that § 2D1.1(b)(12) was modeled after—[the court] reasoned that the phrase is susceptible to 'various formulations,' 'between the

21

poles of incidental use and sole purpose.'" Id. (quoting Shetler,
665 F.3d at 1161 (internal quotation marks omitted)). That was the
extent of Thaxton's analysis under Kisor's first analytical step.

The decision does not consider any statutory or dictionary
definitions for the terms used in the premises enhancement's text,
including the term "purpose" or "distributing." And, aside from
the lack of any textual analysis, Thaxton does not consider the
structure, history, or purpose of the enhancement as required under
Kisor, 588 U.S. at 573, 575, and as this Court must do under Boler,
115 F.4th at 335. Therefore, Thaxton's reasoning and conclusion
are unpersuasive.

### 3.   The Word "The."

Now, there is much dispute over another word in the phrase
"for the purpose of," namely, the article "the." The United States
and Roney both seem to take the view that the statutory term "the"
is ambiguous. So both turn to the Commentary, which, in relevant
part, says that "the" does not mean the "sole," or only, "purpose
for which the premises was maintained," but, instead, to mean "one
of the defendant's primary or principal uses for the premises,
rather than one of the defendant's incidental or collateral uses
for the premises." U.S.S.G. § 2D1.1(b)(12) Comment., n.17
(emphasis added). The United States contends that Roney's "primary
purpose" in the maintenance of his apartment was to distribute

22

drugs, and his (and his family's) residency there was merely "incidental." Roney contends the opposite—that his living at the premises was the primary purpose for it, rendering his drug distribution activities secondary. Both parties are incorrect because at this stage of the analysis, it is entirely inappropriate to consider the Commentary at all. Kisor, 588 U.S. at 575-76; Boler, 115 F.4th at 322-23.

Neither the statute nor dictionaries answer the question. However, the settled law in our circuit tells what the word "the" means when used in the phrase "for the purpose of." Specifically, the phrase for the purpose of was interpreted in United States v. McCauley, 983 F.3d 690 (4th Cir. 2020), albeit in analyzing its use in another statute.

In McCauley, the Fourth Circuit interpreted the text of 18 U.S.C. § 2251(a) which "criminalizes 'employ[ing], us[ing], persuad[ing], induc[ing], entic[ing], or coerc[ing] any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct.'" Id. at 695 (quoting 18 U.S.C. § 2251(a) (emphasis and alterations in original). The district court's instruction told the jury that the purpose did not mean "the defendant's sole purpose," but also advised that "a" purpose was sufficient to convict. Id. at 694.

The Court of Appeals reversed, holding that the instruction was in error. In so doing, McCauley left a somewhat mixed message,

but, when read as a whole, McCauley supports the United States'
view.

At the outset, the Fourth Circuit stated that:

> Put most simply, the statute requires the government to
> prove that creating a visual depiction was "the purpose"
> of an accused for engaging in sexual conduct, not merely
> "a purpose" that may happen to arise at the same instant
> as the conduct.

Id. at 695. The Court of Appeals then made the point that there
exists "a fundamental difference between the [use of] the definite
and indefinite article." Id. But, McCauley goes on to hold that
the statutory text must be interpreted to acknowledge that
fundamental difference, as to which the Court explained:

> The difference is whether the accused's alleged purpose
> carries some predominant weight, as required by the
> plain statutory language, or whether filming was one
> among many, potentially much more significant purposes.
> Indeed, "a purpose" could be merely one in ten as the
> government erroneously argued in closing below, J.A.
> 894-95, without considering any relative weight amongst
> these varying purposes. Under this formulation, "a
> purpose" to record could be "merely incidental" to other
> more significant purposes.

McCauley, 983 F.3d at 695 (citation omitted) (emphasis added). To
emphasize the point, the Fourth Circuit held that "the language
'the purpose' requires that the [offense conduct] be at the very
least a significant purpose in the sexual conduct itself, not
merely incidental." Id. (emphasis in the original). To support
that view, the Fourth Circuit cited Mortensen v. United States,
which interpreted the phrase "for the purpose of" as used in the

24

Mann Act to mean the "dominant motive" behind the offense conduct. <u>Id.</u> at 695-96 (quoting <u>Mortensen v. United States</u>, 322 U.S. 369, 645 S. Ct. 1037, 88 L. Ed 1331 (1944)); (citing <u>United States v. Sirois</u>, 87 F.3d 34, 39 (2d Cir. 1996); <u>United States v. Raplinger</u>, 555 F.3d 687, 693 (8th Cir. 2009)). Both <u>Sirois</u> and <u>Raplinger</u> were also interpreting 18 U.S.C. § 2251(a). In sum, the Fourth Circuit held that the statutory term "the purpose" need not be the sole purpose, but should be interpreted to include a significant or dominating purpose, "or some other equivalent variation." <u>Id.</u> at 697.

So too in the premises enhancement, as in Section 2251(a) and the Mann Act, the same statutory term carries the same meaning. In <u>United States v. Sanders</u>, 107 F.4th 234, 260 (4th Cir. 2024), the Fourth Circuit recently followed the same approach to explaining "the" in an analysis of the phrase "for the purpose of" as was used in <u>McCauley</u> for Section 2251(a). So that is the rule that applies here.

Now, the question is whether the word "the," as interpreted by the Fourth Circuit (and two sister circuits), is genuinely ambiguous. <u>McCauley</u> was based on the Fourth Circuit's statutory interpretations of "the." And, in the Court of Appeals' analysis, there is no suggestion that the statutory term is ambiguous. That the analysis approved three possible meanings—the "dominant purpose," "a motivating purpose" or "some other equivalent

25

variation" does not spell ambiguity. First, the variants—"motivating purpose" and "dominant purpose" are virtually the same. Second, any other variant must be equivalent and thus must likewise be the same. Third, the terms are clear and point in the same direction.

The unambiguous meaning, then, is that the purpose must be a dominant or motivating one, not an incidental one. Thusly instructed by our Court of Appeals, the analysis need go no further.

But, if the meaning specified in McCauley and Sanders were found to be ambiguous, Roney's alternative argument would nonetheless fail because the ambiguous meaning is virtually identical to the Commentary, which establishes the reasonableness of the Commentary.

That is also how the Fourth Circuit has traditionally understood the premises enhancement. In several decisions following the promulgation of the premises enhancement and its Commentary, the Fourth Circuit has applied the enhancement to individuals who maintained a premises for several purposes, which include distributing and/or manufacturing drugs as well as treating the premises as their permanent residence. E.g., United States v. Hoffler, No. 22-4101, 2022 U.S. App. LEXIS 35773, (4th Cir. Dec. 28, 2022) (per curiam) (unpublished) ("[U]nder this Guideline, a premises 'may have more than one primary' use . . .

This is true even for a residence, 'where the activity of living there will invariably be the main' purpose." (quoting, first, U.S.S.G. § 2D1.1(b)(12) Comment. N.17, then, <u>United States v. Bell</u>, 766 F.3d 634, 638 (6th Cir. 2014))); <u>United States v. Messer</u>, 655 Fed. App'x 956, 959 (4th Cir. 2016) (per curiam) (unpublished) ("[A]lthough the barn was frequently used to house and care for horses, a premises can have more than one primary purpose." (citing <u>United States v. Miller</u>, 698 F.3d 699, 707 (8th Cir. 2012) (holding that the enhancement applies "when a defendant uses the premises for the purpose of substantial drug trafficking activities, even if the premises was also [the defendant's] family home at the times in question."))).

When combined with the definition of "distributing" set out above, the phrase "for the purpose of . . . distributing" unambiguously means that the defendant must have maintained the premises for the primary (dominant or significant) purpose of conveying or transferring controlled substances to others.

## B. TYPES OF CONDUCT THAT DO NOT TRIGGER THE APPLICATION OF THE PREMISES ENHANCEMENT.

The parties disagree over what conduct is encompassed by the premises enhancement. The United States contends that, under a genuinely ambiguous reading of the premises enhancement, the act of storing drugs at the premises as well as the act of possessing the drugs with the intent to distribute those drugs are independent

bases that would each constitute conduct that constitute maintaining a premises "for the purpose of . . . distributing." Roney disagrees and contends that, under an unambiguous reading of the premises enhancement, neither storage nor possession with intent to distribute drugs is within the scope of the premises enhancement. Instead, Roney contends that the only conduct encompassed by the term "distributing" is the physical act of transferring a controlled substance from the defendant to another individual at the premises itself. In Roney's view, that interpretation would foreclose application of the premises enhancement to him because, although Roney did possess with the intent to distribute drugs and store drugs at the premises, he did not actually, physically transfer or convey the drugs to another individual at the premises—he only did so at other locations.[7]

### 1. At The Premises.

We start this facet of the analysis by considering Roney's "at the premise" contention. It fails because the statute contains no such limitation. Drug distribution involves many activities and, in enacting Title 21, Congress intended to prohibit the panoply of actions that comprise drug trafficking. Gore, 154 F.3d at 46. Not all of those activities occur "at the premises." See

---

[7] At oral argument, Roney argued in the alternative that, even if the distribution did not have to occur at the premises, his conduct in this case would not rise to that within the scope of the premises enhancement.

Brunty, 701 F.2d at 1381. So, limiting the premises enhancement only to hand-to-hand transfers at the premises finds support neither in the stated intent of Congress nor in the statute it enacted. And such an interpretation would run afoul of Purks which held that distribution "does not simply mean the moment when the defendant 'fully relinquishes possession' or receives the payment." United States v. Purks, 139 F.4th at 402 (quoting United States v. Brunty, 701 F.2d 1375, 1380-82 (11th Cir. 1983) (alteration removed).

### 2. The Storage Of Controlled Substances.

Whether the phrase "maintained the premises for the purpose of . . . distributing" in the premises enhancement encompasses the conduct of solely storing drugs at the premises is precluded by the history of the statute that undergirds the premises enhancement and what that history informs us about the meaning of the premises enhancement's text itself.

In 2010, Congress enacted the Fair Sentencing Act of 2010 ("FSA"). As part of that law, Congress issued a directive to the Commission, instructing it to create the premises enhancement to further punish drug possessors or distributors who, in addition to their possessive or distributive activity, "maintained an establishment for the manufacture or distribution of a controlled substance as generally described in section 416 of the Controlled Substances Act (21 U.S.C. [§] 856)." Fair Sentencing Act of 2010,

29

Pub. L. No. 111-220, § 6, 124 Stat. 2372, 2373 (emphasis added)
(citing 21 U.S.C. § 856).

The text of § 856 has not changed since Congress' directive.
In pertinent part, 21 U.S.C. § 856 criminalizes the maintenance or
control or management of a premises for the purpose of
"manufacturing, distributing, storing, or using" a controlled
substance. 21 U.S.C. § 856(a)(1)-(2) (emphasis added). In other
words, when Congress wrote 21 U.S.C. § 856, it specified four
prohibited activities: manufacturing, distributing, using, and
storing drugs. Congress knows how to write legislation, and so it
must be understood that Congress intended these four actions to
have distinct meanings.

However, when Congress instructed the Commission to create
the premises enhancement, it told the Commission only to create an
enhancement that further punished individuals who "manufacture or
distribute" drugs pursuant to 21 U.S.C. § 856, omitting the conduct
of storing or using. Congress could have instructed the Commission
to create an enhancement that further punished individuals who
maintained a premises for the purpose of "manufacturing,
distributing, using, or storing" controlled substances—just as
Congress itself had written in 21 U.S.C. § 856. But it did not.
So, the instructing statute did not include storing or possession
with intent to distribute.

The Commission followed Congress' directive in § 856

30

literally: It promulgated the premises enhancement to additionally punish only defendants who maintained a premises for the purpose of "manufacturing or distributing" controlled substances. Compare U.S.S.G. § 2D1.1(b)(12), with § 6, 124 Stat. at 2373. The plain text of 21 U.S.C. § 856 thus tells us that the acts of manufacturing, distributing, using, and storing are unique, independent acts lest one term render any of the other terms surplusage. So too, then, must the terms manufacturing and distributing as used in the premises enhancement be definitionally distinct from each other and from the other verbs (storing and using) used in 21 U.S.C. § 856. By its plain meaning, then, the unambiguous text of the premises enhancement cannot include within its meaning the further punishment of the acts of using or storing drugs at that premises in question. Consequently, the premises enhancement cannot apply to Roney if the sole basis upon which it is based is that he stored drugs in the premises for distribution at a later time and at other locations aside from the premises.

As discussed previously, distribution includes all acts perpetrated in furtherance of drug trafficking activity. Supra. Therefore, distribution conceptually could include storing, which is an act perpetrated in furtherance of drug trafficking activity. And, indeed, storing would be included but for the definitional anomaly created by the instruction given by Congress in the FSA wherein Congress did not include the acts of storing or use that

31

are distinctly separated in § 856.

Where Congress has chosen to excise the distinct acts of use and storage, those acts cannot be reinserted by administrative (the Commission) or judicial decision simply because those acts often are perpetrated in furtherance of drug trafficking. Congress created that anomaly and it is for Congress, not the Commission, or the courts to undo what Congress created.

The determination that the premises enhancement does not encompass the act of storing drugs at the premises for the purpose of distributing them is in tension with a recent unpublished decision of the Fourth Circuit which held that the premises "enhancement can apply when a premises is used simply to store drugs for distribution." United States v. Oviedo, No. 22-4690, 2024 U.S. App. LEXIS 18995, at *4 (4th Cir. July 31, 2024) (per curiam) (unpublished). The Fourth Circuit reached that conclusion in Oviedo by relying on what the "commentary to USSG § 2D1.1 explains as to the premises enhancement." Id. However, Oviedo predates Boler.

Consequently, Oviedo did not conduct a full Kisor and Boler analysis of the premises enhancement, and it did not determine whether the enhancement's text was genuinely ambiguous before examining the Commentary. Instead, Oviedo used the Commentary to determine how the enhancement should apply to the facts of that case. Because Oviedo predates, and therefore, does not use, Boler's

32

analytical framework, its holding does not control the decision to be made today. See Crawford, 2025 U.S. Dist. LEXIS 145349, at *32-33.

### 3. The Possession Of Controlled Substances With Intent To Distribute.

When it comes to possession with intent to distribute controlled substances, a review of the text and history of the premises enhancement provides less clear answers. Ultimately, however, the unambiguous meaning of the premises enhancement does not include such conduct.

Again, we recall that 21 U.S.C. § 856 encompasses four specific types of conduct: the manufacture, distribution, use, and storage of controlled substances. 21 U.S.C. § 856. The premises enhancement was promulgated in direct response to Congress' directive in § 856. And, as explained above, the enhancement cannot be read to encompass more conduct than Congress proscribed in § 856. The problem for the United States' argument, then, is that § 856 does not include possession with intent to distribute a controlled substance.

That problem is worsened by the fact that another section of Title 21 does criminalize possession with intent to distribute controlled substances. Indeed, that is the statute of conviction in this case. 21 U.S.C. § 841(a) ("[I]t shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute,

or dispense, <u>or possess with intent to</u> manufacture, <u>distribute</u>, or dispense, a controlled substance.") (emphasis added).

Interpretations of a statute should not cause its text to "duplicate another provision or [cause the other provision] to have no consequence." Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 174 (1st ed. 2012). And, when interpreting the "plain meaning of [a] statute, the court must look to the particular statutory language at issue, <u>as well as the language and design of the statute as a whole.</u>" <u>K Mart Corp v. Cartier</u>, 486 U.S. 281, 291, 108 S. Ct. 1811, 100 L. Ed. 2d 313 (1988) (citing <u>Bethesda Hosp. Ass'n v. Bowen</u>, 485 U.S. 399, 403-05, 108 S. Ct. 1255, 99 L. Ed. 2d 460 (1988); <u>Offshore Logistics, Inc. v. Tallentire</u>, 477 U.S. 207, 220-21, 106 S. Ct. 2485, 91 L. Ed. 2d 174 (1986)) (emphasis added).

Applications of these canons of statutory interpretation teach that "distributing," as used in 21 U.S.C. § 856, does not include the act of possessing with intent to distribute controlled substances, as used in 21 U.S.C. § 841(a).

Section 841(a) demonstrates that Congress clearly intended to differentiate between the criminal act of distribution on one hand from the criminal act of possession with intent to distribute on the other. <u>United States v. Randall</u>, 171 F.3d 195, 206 (4th Cir. 1999) ("Distribution and possession with intent to distribute are two separate trafficking offenses, two separate crimes." (quoting

34

United States v. Willoughby, 27 F.3d 263, 266 (7th Cir. 1994) (internal quotation marks omitted))). Thus, because Section 856 only prohibits the act of "distributing," and is silent on prohibiting the separate criminal act of possessing with the intent to distribute controlled substances, Section 856's language cannot be interpreted to include the latter. And, because the Commission promulgated the premises enhancement to explicitly encompass only some of the prohibited activity in Section 856, the premises enhancement, then, cannot be said to encompass the unincluded conduct of possession with intent to distribute. In sum, to read the premises enhancement in a way that includes the act of possession with intent to distribute drugs would impute meaning into one statutory provision (21 U.S.C. § 856) that has been clearly foreclosed by the text of a different provision in the same statute (21 U.S.C. § 841(a)), thereby rendering Congress' distinction between those two separate criminal acts meaningless.

An interpretation of the term "distribute" to exclude the conduct of "possession with intent to distribute" is, at first glance, a curious one, because it is somewhat difficult to comprehend a situation where one can distribute a controlled substance without first possessing that substance with the intent to distribute it. However, "[i]t is possible—albeit unusual—to be guilty of distribution of a drug without also possessing it with intent to distribute it." United States v. Sepulveda, 102 F.3d

35

1313, 1317 (1st Cir. 1996). Several circuit courts have understood that possession with intent to distribute a controlled substance is not a lesser included offense of distribution and, therefore, that the act of distribution does not necessarily include the conduct of possession with intent to distribute. Id.; United States v. Stevens, 521 F.2d 334, 337 n.2 (6th Cir. 1975) ("The possession with intent charge can be proved without proof of actual distribution and the distribution charge can conceivably be proved without proof of possession."); United States v. Jackson, 213 F.3d 1269, 1297 (10th Cir. 2000) ("Although it may be unusual for a person to distribute a controlled substance without at least momentarily possessing the controlled substance, it is not impossible."); Gore, 154 F.3d at 45 (noting that other "cases suggest that '[t]he possession with intent charge can be proved without proof of actual distribution and the distribution charge can conceivably be proved without proof of possession,'" and agreeing with that conclusion (quoting Stevens, 521 F.2d at 337 n.2)). The Fourth Circuit suggested the same in Randall, 171 F.3d at 209 ("Clearly, distribution requires an element that is not an element of possession with intent to distribution—distribution. Also, possession with intent to distribute requires an element that is not necessarily an element of distribution—possession." (citing Gore, 154 F.3d at 45)). Therefore, the text and history of the premises enhancement support the conclusion that its

36

unambiguous meaning excludes the conduct of possession with intent to distribute as a sufficient nexus with the premises to warrant application of the enhancement.

As explained previously, distribution of controlled substances includes all acts perpetrated in furtherance of the drug trafficking. <u>Supra</u>. But, because the statutory meaning of distribution does not include the act of possession with intent to distribute, the premises enhancement cannot be interpreted to include that act either.

### C. THE UNITED STATES HAS NOT PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT THE PREMISES ENHANCEMENT APPLIES TO RONEY.

That then brings us to whether the United States has proved that Roney's offense conduct—apart from storage or possessing with intent to distribute—permits application of the enhancement. The answer is no.

The "application of the premises enhancement is a fact-specific inquiry that considers the totality of the circumstances." <u>United States v. Carabajal</u>, 717 Fed. App'x 234, 237 (4th Cir. 2018) (per curiam) (unpublished). The United States must prove those facts by a preponderance of the evidence. <u>Harvey</u>, 532 F.3d at 337. In this case, the United States has not proven by a preponderance of the evidence sufficient facts to warrant the application of the premises enhancement to Roney.

The parties agree on most of the pertinent facts. They agree that Roney's residence constitutes a premises within the meaning

37

of the premises enhancement. Neither party disputes that Roney did, in fact, maintain the premises, which was his apartment. ECF No. 56, at 7. Roney lived in that apartment with his fiancée and father. Further, the parties agree that Roney stored the controlled substances at that premises, and that he took those drugs from the premises and distributed them at other locations offsite. ECF No. 56, at 21, 47-48. There is no evidence that Roney ever sold drugs at, on, or in the premises, and neither party claims that distribution occurred at, on, or in the premises. The parties also agree that the quantity of the drugs at issue—almost ten kilograms—is a distribution quantity, rather than a quantity that suggests mere possession for personal use. Id. at 67. Roney also does not contest ownership of the drug paraphernalia (the packaging materials, digital scales, a mechanical press, multiple cell phones, a money counter). Nor does he deny that $55,945.00 in cash was seized from his apartment. PSR, ¶¶ 9, 16.[8]

Roney did store a distribution quantity of drugs at his premises. In the apartment, Roney also did possess those drugs with the intent to distribute them at other locations. However, as explained above, the premises enhancement is not animated by the

---

[8] The only factual dispute that exists is on Roney's modus operandi. On that point, the United States contends that Roney stored, but did not distribute, the controlled substances on the premises as a means to avoid detection of and capture for his illegal activities. ECF No. 56, at 47-51, 53.

acts of storage of drugs or the possession with intent to distribute those drugs on the premises. So, for the premises enhancement to apply here it must be shown that the distribution itself had some nexus or connection to the premises itself other than storage or possession with intent to distribute.

As the analysis above demonstrates, distribution is defined broadly and acts that are perpetrated in furtherance of transfer or sale are included within the definition of distribution. But it is up to the United States to prove the nexus between the premises and acts perpetrated in furtherance of transfer or sale. That can be done in the Statement of Facts that accompanies entry of a plea, by stipulated evidence, or by testimony at trial or sentencing. None of that was done here. Instead, the United States relied on the storage and possession with intent to distribute. As explained above, neither animates the premises enhancement.

Apart from its reliance on storage and possession with intent to distribute (which, as explained above, cannot be the nexus), the United States also argues that the paraphernalia (packaging, supplies, scales, money counter, and money) proves that the premises was maintained for the purpose of distribution. That evidence does permit an inference in the United States' favor. But, that inference does not constitute a preponderance of the evidence showing the purpose of maintaining the residence. Nor does the inference give rise to a rebuttable presumption that would

39

require the defendant to rebut it. That would impermissibly shift the burden of proof on objection to the defendant. See Crawford, 2025 U.S. Dist. LEXIS 145349, at *64 (citing United States v. Perez, 5 F.4th 390, 406 (3d Cir. 2021) (Bibas, J., concurring in the judgment); see also Kiulin, 360 F.3d at 460. Thus, the objection was sustained.

As the United States says, some cases suggest that the discovery of drug paraphernalia on the premises is sufficient to apply the premises enhancement to an individual. United States v. Adams, 860 Fed. App'x 290, 292 (4th Cir. 2021) (per curiam) (unpublished) (holding that the premises enhancement applied to a defendant who, in the premises, possessed "a distribution level amount of the drug . . . currency, a money counter, cellular phones, and a ledger with nicknames of [the defendant's] co-conspirators"); United States v. Winburn, 672 Fed. App'x 325, 326 (4th Cir. 2017) (per curiam) (unpublished) (holding that, in addition to other evidence, "drug paraphernalia such as digital scales, razors, and plastic baggies from the residence" supported application of the premises enhancement to the defendant). However, a critical piece of evidence that tied that distribution-related activity to the premises in all of these cases was the actual, physical transfer of the controlled substance to another individual while at or on the premises itself. That is not what happened in this case. So, those decisions do not help the United

40

States here.

## V. CONCLUSION

For the foregoing reasons, the Court sustained Roney's OBJECTION, ECF No. 30, and did not apply the two-point premises enhancement, U.S.S.G. § 2D1.1(b)(12).

It is so ORDERED.

_____ /s/  _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 3 , 2025

41